# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | Marvin E. Aspen |
|---|---|---|---|
| **CASE NUMBER** | 00 C 50430 | **DATE** | 8/22/2001 |
| **CASE TITLE** | | EVANS vs. MASSANARI | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached order, Defendant's motion for summary judgment is denied. Plaintiff's motion for a summary judgment is granted in part and denied in part. This case is remanded to the Commissioner for proceedings consistent with the attached opinion. Enter attached Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | AUG 22 2001 | | 15 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| tml | courtroom deputy's initials | U. S. DISTRICT COURT | 8/22/2001 date mailed notice | | |
| | | CLERK 2001 AUG 22 PM 2: 25 | 88 mailing deputy initials | | |
| | | Date/time received in Central Clerk's Office | | | |

FILED-WD    DOCKETED

2001 AUG 22  PM 2: 25  AUG 22 2001

CLERK
U. S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

WILLIAM E. EVANS,                    )
                                     )
        Plaintiff,                   )        Case No.  00 C 50430
                                     )
        v.                           )        Philip G. Reinhard
                                     )        P. Michael Mahoney
LARRY G. MASSANARI,                  )
Acting Commissioner                  )
Social Security                      )
                                     )
                                     )
        Defendant.                   )

### Memorandum Opinion and Order

Plaintiff, William M. Evans, (Plaintiff) seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Insurance (SSI) benefits pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on March 30, 2001. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

On August 19, 1992, Plaintiff was found to be disabled within the meaning of the Social Security Act as of February 22, 1988. (Tr. 15). Disability benefits were initially denied by the presiding Administrative Law Judge (ALJ); however, the Appeals Council vacated that decision and

remanded the case for further proceedings. (Tr. 43). On remand, the ALJ found that Plaintiff was disabled and suffered from alcohol dependence and personality disorders. (Tr. 48–49). The case was reviewed on September 1, 1995, and a determination indicated that Plaintiff had medically improved and was no longer disabled. (Tr. 16). Plaintiff promptly filed a Request for Reconsideration and Disability Cessation on October 4, 1995. (Tr. 98-99). Plaintiff's current claim of disability is now based on recurrent back pain and hypertension. On September 9, 1996, the agency denied the Request for Reconsideration, and a Notice of Reconsideration was issued that denied Plaintiff's SSI benefits. (Tr. 122-23). Plaintiff then filed a timely Request for Hearing on September 10, 1996, and appeared, with counsel, before the ALJ, on September 3, 1998. (Tr. 277). On November 25, 1998, the ALJ concluded that Plaintiff was not disabled and was not eligible for SSI benefits. (Tr. 14–20). Subsequently, Plaintiff filed a timely Request for Review of Hearing Decision/Order on December 2, 1998. (Tr. 8–11). The ALJ's decision became the final decision of the agency when the Appeals Council denied review on October 6, 2000. (Tr. 5).

## II.  FACTS

At the time of the hearing Plaintiff was forty-nine years old, born on November 27, 1949, in Lambert, Mississippi. (Tr. 280). Plaintiff attended school sporadically until the ninth grade at which time he dropped out completely. (Tr. 281). Plaintiff testified that he has problems with both reading and writing and particular difficulty comprehending what is read. (Tr. 281). While Plaintiff is sometimes able to read his business mail, most of the time he requires assistance. (Tr. 281–282).

Plaintiff's prior work experiences include asbestos removal, automotive management, and various temporary positions. (Tr.282–284). From the late eighties until the early nineties, Plaintiff

worked numerous temporary factory positions. (Tr. 284). All of these positions were short term and

lasted less then a month each. (Tr. 281) Plaintiff asserted that the longevity of the positions was due

to his recurrent back pains. (Tr. 284–285). His last full–time position was that of an asbestos

remover from 1984 to 1986. (Tr. 282). In this position, Plaintiff performed asbestos removal in

school buildings. (Tr. 282). Plaintiff testified that his primary duty was scraping and this act was

performed in a sitting position. (Tr. 295). Prior to this, Plaintiff served as a manager at Clark

Gasoline Station for a little less then a year. (Tr. 283). Plaintiff contends that he did not perform

any paper work, nor organize any payroll or financial records. (Tr. 296). Instead, Plaintiff indicated

that he supervised numerous employees and was on call when problems arose at the station.

(Tr. 296–297). Prior to Clark, Plaintiff was employed at General Electric as a sander. (Tr. 299). In

this capacity, Plaintiff resanded refrigerator frames and was required to stand a majority of the time.

(Tr. 283).

　　A Residual Functional Capacity Assessment (RFC) was performed on August 11, 1995. (Tr.

174-181). The RFC suggested that Plaintiff had no postural, visual, manipulative, communicative

or environmental limitations. (Tr. 176-179). It was determined that Plaintiff could lift or carry fifty

pounds occasionally and twenty-five pounds frequently. (Tr. 175). The RFC also indicated that

Plaintiff could stand, walk or sit with normal breaks for about six hours in an eight hour day. (Tr.

175). The RFC was reviewed on September 19, 1995. (Tr. 184-185). The review supported all of

the determinations and limitations that were previously imposed. (Tr. 184-185). The results of the

RFC were utilized as a key factor in developing Plaintiff's vocational evaluations. (Tr. 130).

Plaintiff was evaluated by Jeff Edmonds, a vocational expert, on August 29, 1995. (Tr. 130). Mr.

Edmonds concluded that Plaintiff could perform the full range of medium work activity. (Tr. 130).

Some examples of jobs that Plaintiff could perform included a Tire Balancer (rubber, tire and tube) 750.687-014; Box Bender (paper goods) 641.687-010; and Wheel Assembler (transportation equipment) 809.684-0138. (Tr. 130). The U.S. Bureau of the Census, County Business Patterns, Illinois 1991 indicated that there are approximately 5,365 people employed in the rubber, tire and tube industry, 33,681 people employed in the paper goods industry and 39,681 people employed in the transportation equipment industry. (Tr. 130).

A Residual Functional Capacity Assessment was again performed on March 22, 1996. (Tr. 207-214). It also revealed that Plaintiff was free of postural, manipulative, visual, communicative and environmental limitations. (Tr. 209-212). However, it was determined that Plaintiff could lift only twenty pounds occasionally and ten pounds frequently. (Tr. 208). That RFC also indicated that Plaintiff could stand, walk or sit with normal breaks for about six hours in an eight hour day. (Tr. 208).

Christopher Yep, a vocational expert, testified at Plaintiff's hearing on September 3, 1998. (Tr. 306-314). Mr. Yep classified Plaintiff's past skill level as mostly unskilled and past exertional limitations as medium to light level. (Tr. 308). The ALJ presented Mr. Yep with varied hypothetical situations, involving individuals with various functional limitations, and asked him to offer an opinion as to their capabilities. The first hypothetical involved an individual with the same education, age range and work experience as Plaintiff. While the individual maintained the ability to lift up to twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight hour day, he could not bend frequently and required an unlimited amount of sitting. (Tr. 309-310). Mr. Yep opined that the hypothetical individual would be able to perform work as a hand packager, inspector or cashier. (Tr. 310). In the State of Illinois there are 44,773 hand packager

positions, 24,457 inspection positions and 129,117 cashier positions. (Tr. 310).

The ALJ then modified the hypothetical to account for an individual that was required to maintain a sit/stand position and restricted in the amount of multiple tasks performed. (Tr. 310). Although the modifications eliminated the hand packager and inspector positions, the cashier position was retained and a rental clerk and gate guard were added. (Tr. 311). Next the ALJ added illiteracy to the hypothetical. (Tr. 311) With that limitation, all of the previously named positions were eliminated. (Tr. 311-312). The sit/stand option was then removed and the positions of inspector and hand packager were again viable. (Tr. 312). While the last addition consisted of a tolerable absenteeism rate and limited public interaction, it did not alter the assessment or the number of positions available in the economy. (Tr. 312-312).

### III.    MEDICAL HISTORY

### PHYSICAL IMPAIRMENTS

Plaintiff filed a report of continuing disability on November 27, 1989. (Tr. 83). In this report Plaintiff alleged that his condition had worsened and that he suffered from consistent back pain and hypertension. (Tr. 83). Plaintiff indicated that he is able to go fishing and clean house when not in pain. (Tr. 88). However he also contended that he is unable to hold a steady position as a direct result of his frequent inability to get out of bed. (Tr. 88-89).

A medical report dated March 5, 1993, stated that Plaintiff suffered from hypertension and alcoholism. (Tr. 151). A Progress Report on May 25, 1993, indicated that Plaintiff complained frequently of lower back pain. (Tr. 153). Upon examination, Plaintiff was able to independently get up on and off an examination table and walk on both his heels and toes. (Tr. 155-156). Furthermore,

Plaintiff walked with a normal gait and was able to squat without apparent difficulty. (Tr. 155). On June 7, 1993, Plaintiff visited a physician complaining of a sore throat, cold and congestion. (Tr. 153).

Plaintiff visited a physician on November 18, 1994, complaining of severe back and neck pain. (Tr. 154). He was prescribed pain medication and directed to return the next month for a follow up examination. (Tr. 154). On December 5, 1994, Plaintiff returned to the doctor and reported that his back and neck had not subsided. (Tr. 154). The doctor prescribed additional pain medication and muscle relaxants. (Tr. 154).

An x-ray examination of March 30, 1995, revealed minor spurring in the lumbar vertebra and minimal disc height loss at L4-5. (Tr. 158). X-rays also indicated that there was no evidence of fractures and the alignment was intact. (Tr. 158). Plaintiff's physician, Dr. John D. Roll, suggested that mild arthritic changes had occurred in the back region. (Tr. 158). In September of 1995, Plaintiff visited a physician on three separate occasions. (Tr. 190). During these occasions, Plaintiff complained of lower back pain and was prescribed Ibuprofin and Minocin. (Tr. 190).

A physical examination on June 13, 1995, found Plaintiff to be alert and orientated with stable vital signs. He was able to walk on his heels and toes and his gait was normal and unassisted. (Tr. 156). Plaintiff was able to independently dress and undress himself and squat and get up from the squatting position. (Tr. 156). An examination of the lumbar spine did not reveal any soft tissue swelling or inflammation. (Tr. 157). Plaintiff's range of motion was flexion sixty degrees, extension ten degrees, lateral bending twenty-five degrees, and rotation seventy-five degrees. (Tr. 157). An x-ray found arthritic changes had occurred with discogenic changes surfacing in L-4 and L-5 region. (Tr. 157). As a result, Dr. Ramchandani, Plaintiff's primary care physician, diagnosed him with

6

chronic backaches secondary to discongenic disease and osteoarthritis involving the lumbar spine. (Tr. 157). Progress notes, dated October 14, 1995, revealed that Plaintiff still suffered from lower back pain and that his range of motion for the lower spine was painful.

Dr. Kenneth O'Neal, from the Rockford Medical Clinic, evaluated Plaintiff on March 14, 1996. (Tr. 204-207). The records indicate that Plaintiff suffered from hypertension, and chronic lower back pain. (Tr. 204). The evaluation also indicated that Plaintiff experienced occasional pain, which radiated down his lower back, and bilateral tingling sensations that traveled down his legs. (Tr. 205). Plaintiff also appeared to be tender in the paravertebral aspect of his lower back. (Tr. 206). Plaintiff's straight leg raising was limited to sixty degrees on the right leg and seventy degrees on the left. (Tr. 206). However, Plaintiff related that on good days he is able to walk approximately four to five blocks. (Tr. 205-206). Dr. O'Neal stated that the etiology of Plaintiff's back pain was not clear and recommended that Plaintiff be considered for disability benefits. (Tr. 206).

In September of 1997, Plaintiff attended a pain clinic at St. Anthony's Medical Center. (Tr. 218-221). There, Plaintiff was treated to three lumbar epidural steroid injections. (Tr. 220). Evaluations on November 4, 1997, concluded that Plaintiff was not a viable candidate for back surgery. (Tr. 254). Rather, treatment at the pain clinic was suggested. (Tr. 245). Plaintiff was admitted to the clinic on November 25, 1997, and was prescribed Hytrin and Ibuprofin. (Tr. 259). Plaintiff attended the clinic periodically throughout May of 1998, in order to receive physical therapy. (Tr. 252). Upon discharge, he was advised to continue stretching and non-impact exercises. (Tr. 261).

On April 6, 1998, Plaintiff was given an epidural block at St. Anthony's Hospital to further relieve his lower back pain. (Tr. 231). Plaintiff visited St. Anthony Medical Center on May 6, 1998,

and was diagnosed with degenerative disc disease with bilateral radiculopathy. (Tr. 248). Dr. Nicholic Sarros reported that the injections appeared to have significantly improved Plaintiff's condition. (Tr. 248). At the hearing, Plaintiff testified that the steroid shots provided temporary relief and have not been effective in the long term. (Tr. 287). A radiology consultation by Dr. James Langen M.D., on March 26, 1999, revealed that Plaintiff's lumbar spine had a slight disc space narrowing at the L4-L5 level. (Tr. 155). There was no evidence of a fracture, dislocation or gross destructive change. (Tr. 155).

At the hearing, Plaintiff testified that his back pain has become progressively worse and now radiates down both legs. (Tr. 287). Additionally, Plaintiff asserted that he also suffers from cramping of the hands and frequent muscle spasms. (Tr. 203-304).

## MENTAL IMPAIRMENTS

A psychiatric review technique form (PRTF) was completed on June 30, 1987. (Tr. 58). The technique reported Plaintiff suffered from personality and substance addiction disorders. (Tr. 58). The review indicated that Plaintiff did not exhibit any evidence of organic mental, schizophrenic, affective, paranoid, psychotic disorders, mental retardation or autism. (Tr. 60-62). However, the report did indicate that Plaintiff maintains inflexible and maladaptive personality traits, as well as intense and unstable interpersonal relationships that result in impulsive and damaging behavior. (Tr. 63-64). Additionally, the report indicated that Plaintiff was slightly limited in his daily activities, had difficulty maintaining social functioning and had deficiencies of concentration, persistence or pace, which resulted in a failure to complete tasks in a timely manner. (Tr. 64-65).

Plaintiff filled out an Activities of Daily Living Questionnaire on July 16, 1991. (Tr. 131). Plaintiff indicated that his back pain began in 1970 after an automobile accident. (Tr. 132). Plaintiff

contended that he experienced pain that affected his mobility and limited his ability to bathe, shop and sleep. (Tr. 131-132). As a result of the pain, Plaintiff asserted that he preferred to be alone and becomes angry when with others. (Tr. 133).

Plaintiff also filled out a Drug and Alcohol Questionnaire at this time. In the questionnaire Plaintiff indicated that he started drinking when he was thirteen years old. (Tr. 137). Plaintiff reported that he frequently experienced both blackouts and severe shaking and that drinking adversely affected his personal relationships. (Tr. 137). However, Plaintiff attested that he was no longer drinking and had been sober for over four months. Plaintiff reported that he attended a treatment program at Evergreen Recovery Center and was currently participating in a program affiliated with his church. (Tr. 137-138).

On August 7, 1992, Plaintiff underwent a psychiatric review. The reviewer noted that Plaintiff suffered from both personality and substance addiction disorders. (Tr. 52). It was also noted that Plaintiff experienced persistent disturbances in mood or affect and intense and unstable interpersonal relationships, as well as, impulsive and damaging behavior. (Tr. 52). The report indicated that Plaintiff was restricted in his daily activities, social functioning, and frequently suffers from deficiencies in concentration, persistence or pace which resulted in a failure to complete tasks in a timely manner. (Tr. 54).

On July 3, 1995, Dr. Gerald K. Hoffman reported to the Bureau of Disability Determination Services that Plaintiff attended a psychiatric interview. (Tr. 159-160). Dr. Hoffman concluded that Plaintiff was uncooperative and portrayed underlying hostility. (Tr. 159). Mentally, Plaintiff appeared alert and his affect was blunted. (Tr. 159). Dr. Hoffman found no indication of perceptual distortions or delusions. (Tr. 159). Plaintiff was aware of the date and year and able to state his

name forwards but not backwards. (Tr. 159). When Plaintiff was questioned about what he would do if he was in a burning movie theater he responded that he would leave and then laughed. (Tr. 159). Plaintiff's abstract thinking was intact and he was able to recite three random words after five minutes and a second try. (Tr. 159). Dr. Hoffman therefore opined that Plaintiff was alcohol dependant and possessed a pain disorder in which he used pain as a solution to the problems of living. (Tr 160).

A Mental Residual Functional Capacity Assessment was performed on August 3, 1995, by Dr. Hudspeth PsyD. (Tr. 161-163). The assessment revealed that Plaintiff was moderately limited in both the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. (Tr. 161). Plaintiff was also moderately limited in his ability to respond appropriately in work settings and in the ability to set realistic goals or make plans independently of others. (Tr. 162). Dr. Hudspeth determined that Plaintiff had made significant improvements in both his mental status and alcohol consumption and therefore could relate in a work setting in which simple and routine tasks were required. (Tr. 163).

Ms. Nancy Dodge RN., performed a telephonic daily activities report on August 3, 1995. (Tr. 139). Ms. Dodge interviewed Mrs. Alberta Evans, Plaintiff's wife, regarding his condition. (Tr. 139). Mrs. Evans noted that Plaintiff needed to be reminded approximately four times each month to bathe and was usually able to straighten up his room without reminder. (Tr. 139). Mrs. Evans reported that Plaintiff was able to cook, read his own business letters, and do some grocery shopping without assistance. (Tr. 139). However, Mrs. Evans also stated that she handled Plaintiff's money and reminded him of appointments twenty-four hours in advance. (Tr. 139). Since the two are separated, she was unable to detail Plaintiff's sleeping habits or his interactions with friends. (Tr.

139).

Nevertheless, she did state that Plaintiff interacted well with family members and attended most family holidays at her home. Mrs. Evans also indicated that Plaintiff frequently complained of back pain and difficulty in mobility. (Tr. 140).

In a memorandum by Michael Kovar Ph.D, dated September 19, 1995, it was asserted that there was not a significant difference between Plaintiff's June 1988 and 1995 Psychiatric Evaluations, except for the notation that Plaintiff's functioning appeared to have improved in terms of his ability to undertake independent activities and self-care. (Tr. 188). On March 11, 1996, Plaintiff underwent a psychiatric assessment by Dr. Delsie Gavali. (Tr. 191-192). Dr. Gavali remarked that Plaintiff appeared well groomed and cooperative but was unable to name any Presidents, other than Clinton, perform serial sevens or name five major cities. (Tr. 192). Plaintiff was also unable to answer abstract thinking questions and when asked what he would do if he was in a theater when a fire broke out he responded that he would get away from it. (Tr. 192). Plaintiff scored a 40 on the Global Assessment of Functioning (GAF) exam, which indicated the presence of a major impairment. (Tr. 192). Dr. Gavali diagnosed Plaintiff with panic disorder with agoraphobia, alcohol dependence and a borderline intellect. (Tr. 192).

A Psychiatric Review Technique, completed on March 13, 1996 concluded that Plaintiff's mental impairments were not severe. (Tr. 194-204). The reviewer noted numerous meetings in which Plaintiff's appearance ranged from that of disheveled to well groomed. (Tr. 203). The reviewer noted that Plaintiff scored a 49, 54 and 47 on various IQ tests. (Tr. 203) However, it was contended that Plaintiff was likely much brighter then the results indicated. (Tr. 203). This conclusion was based on Plaintiff's apparent lack of effort and interest at the time of the

11

examinations. (Tr. 203). As a result, it was concluded that Plaintiff has the capacity to perform simple and routine tasks. (Tr. 203).

Plaintiff underwent a psychiatric consultation on May 12, 1998, by Mr. John Peggau, Psy.D. (Tr. 234-241). During the examination Plaintiff was administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R). (Tr. 335). Plaintiff scored a full IQ below fifty, a verbal IQ below fifty and a performance IQ below fifty. (Tr. 335). Mr. Peggau reported that Plaintiff's effort was limited at best. (Tr. 236). Plaintiff was unable to name the colors in the American Flag, other than red, and did not know the shape of a ball or the purpose of a thermometer. (Tr. 236). Furthermore, Plaintiff was unable to complete any of the sequencing and organizational tasks of picture arrangement. (Tr. 236). Mr. Peggau concluded that Plaintiff's test results were the product of his lack of effort rather than his mental ability. (Tr. 233). Consequentially, it was reported that his ability to maintain ongoing employment would be guarded at best. (Tr. 233). It was further suggested that any benefits, if awarded, should be channeled through a third party rather than the Plaintiff. (Tr. 233).

A medical assessment of Plaintiff's mental ability to perform work related activities was performed on May 14, 1998. (Tr. 239-240). The assessment revealed that Plaintiff possessed a poor ability to follow rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with stresses, function independently and maintain concentration. (Tr. 239). However, when pressed and directly supervised, Plaintiff was able to perform tests but gave up very easily. (Tr. 240). Plaintiff was unable to state the colors of the American flag and the shape of a ball. (Tr. 240). Mr. Peggau Psy.D. again concluded that Plaintiff put forth little effort throughout the duration of the examination and the results were therefore unreliable. (Tr. 240).

Plaintiff was referred for alcohol treatment by the Social Security Administration on May 15,

1996. (Tr. 147). Compliance was indicated at that time. However, a letter dated May 20, 1996, reported that compliance was no longer present. (Tr. 148).

On August 3, 1998, another Psychiatric Review Technique Form was completed on Plaintiff. (Tr. 165-174). In the review, Dr. Hudspeth determined that Plaintiff exhibited no symptoms of organic, schizophrenic, paranoid, psychotic, affective, personality or anxiety disorders. (Tr. 167-168). Plaintiff was also found to be free of mental retardation and autism. (Tr. 169). However, it was determined that Plaintiff was slightly limited in his daily activities and possessed slight difficulties in maintaining social functioning. (Tr. 172). It was also noted that Plaintiff often exhibited deficiencies of concentration, persistence or pace which resulted in the failure to complete tasks in a timely manner or setting. (Tr. 172).

A PRTF was again completed on November 25, 1998. (Tr. 21). It reported that Plaintiff suffered from mental retardation and autism, as well as, personality disorders and substance addiction disorders. (Tr. 21). It was also noted that Plaintiff exhibited persistent disturbances of mood or affect and pathological dependance, passivity or aggresivity. (Tr. 21-22). Plaintiff's daily activities were assessed as moderately restricted, with slight difficulties in maintaining social function and deficiencies of concentration, persistence or pace which resulted in a failure to complete work in a timely manner. (Tr. 23-24).

IV.     **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or

13

substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision."

*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).


## V.   FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

---

[1] The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not,

the claimant will be found to be disabled.

## VI. **ANALYSIS**

The Court will proceed with the five step sequential analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on November 25, 1998. (Tr. 14-20).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and forty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing Step Two of the Analysis the ALJ determined that Plaintiff suffered from severe impairments. Specifically, the ALJ found that Plaintiff suffered from back pain and hypertension. (Tr. 16).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is therefore affirmed.

18

C.     Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 15-16 ).  The ALJ found that Plaintiff has shown medical improvement and possesses the residual functional capacity to perform work requirements.  The record demonstrates that Plaintiff's disability claim rests primarily on his recurrent back problems.  Plaintiff testified that he injured his back in a 1970 automobile accident and has experienced problems ever since.  (Tr. 284).

Plaintiff contends that the ALJ failed to consider the severity of Plaintiff's combined impairments.  However, the ALJ did address both Plaintiff's mental and physical impairments and found that, even in combination, they were not sufficiently severe. (Tr. 16-17).  Upon an examination of the medical record, the ALJ found that Plaintiff's subjective claims of back pain were not substantiated by the full weight of the medical evidence. (Tr. 16.)

A physical examination, on March 30, 1995, revealed that Plaintiff exhibited minor spurring in the lumbar region with mild arthritic changes. (Tr. 158).  There was no evidence of fractures and only a minimal disc space loss at L4-5 was established. (Tr. 158).  Subsequent examinations in June of 1995, found Plaintiff capable of independently squatting and walking on his heels and toes. (Tr. 156-157).  Plaintiff's range of motion was flexion sixty degrees, extension ten degrees, lateral bending twenty-five degrees and rotation seventy-five degrees. (Tr. 157). In 1996, Plaintiff attended the Rockford Medical Clinic. (Tr. 204-207).  While evaluations revealed Plaintiff was tender in the paravertabral aspect of the lower back, he was able to walk approximately four to five blocks, on good days. (Tr. 205-206).

Since 1997, Plaintiff has undergone three sets of lumbar epidural steroid injections for his degenerative disc disease. (Tr. 220, 248). Plaintiff testified that the injections provided temporary relief. (Tr. 287). Dr. Lyddon opined that Plaintiff was not a candidate for back surgery but should pursue treatment a pain clinic. (Tr. 245). Plaintiff attended the clinic in 1997 and was advised to continue strength exercises after he was discharged. (Tr. 231). Plaintiff's last consultation occurred on March 26, 1999. (Tr, 155). While it detailed a slight disc space narrowing at the L4-L5 level, there was no evidence of gross destructive change, fracture or dislocation. (Tr. 155). Furthermore, Plaintiff testified, on multiple occasions, that he is able to cook, clean house, go fishing and attend church. (Tr. 103, 132,139, 142).

Plaintiff also contends that the ALJ failed to consider Plaintiff's psychological impairments when evaluating the severity of the combination of impairments. Specifically, Plaintiff contends that the ALJ did not account for Plaintiff's diagnosis of panic disorder with agoraphobia. (Tr. 192). The record indicates that the ALJ did examine Plaintiff's psychological evaluations and found the diagnosis to be non-credible. (Tr. 16-17). Since 1987, Plaintiff has undergone numerous psychological evaluations, all of which have yielded varying results. (Tr. 58, 133, 159-160,188, 192-204). In two of the psychological examinations, evaluators reported that Plaintiff was purposely unresponsive. (Tr. 159-236). Consequently, the low test results were viewed as a reflection of effort rather than intellect. (Tr. 159, 236). Although Plaintiff was interviewed on multiple occasions, only one doctor, in 1996, opined that Plaintiff suffered from panic disorder with agoraphobia. (Tr. 191-192). Plaintiff was assessed several times after this evaluation and there is no record present of a corresponding diagnosis. (Tr. 21, 147, 172). Furthermore, absent from the record is any mention of treatment for this diagnosis. (Tr. 17). Conversely, medical treatment appears to be routine and

conservative in nature. (Tr. 17). Because of the divergence in evaluations and the notable uncooperation of the Plaintiff, the ALJ relied on the totality of the medical evidence and found that Plaintiff does not meet or exceed the Commissioner's listing of impairments. This court is concerned about the lack of conclusive results regarding Plaintiff's mental impairments.

While this court does commend the ALJ for recognizing the need for a consultative psychological exam, given the lack of definitiveness in the results of that exam, this court finds that the ALJ's determination that Plaintiff's impairment does not meet the severity required in the Listings is not supported by substantial evidence. The record indicates that Plaintiff suffers from significant mental impairments and on the occasions where he has been tested, his I.Q. has been consistently below 50. Further, the record is full of examples of Plaintiff suffering from impaired memory. Plaintiff's wife testified that she has to remind Plaintiff of his appointments and occasionally to bathe himself. (Tr. 139). Also, Plaintiff's wife testified that she handles Plaintiff's money and it was noted in several psychological reports that Plaintiff should not be allowed to handle his own finances. (Tr. 139, 233).

It appears, from the records, that Plaintiff has technically met the requirements contained in the Listing for mental retardation. Section 12.05(B) of the Listings provides that a claimant must demonstrate "A valid verbal, performance or full scale IQ of 59 or less". While the ALJ and the administering psychologists have questioned the validity of Plaintiff's scores on the IQ tests administered, there has been no actual determination as to what Plaintiff's score actually is. Thus, Plaintiff is left with no way to determine whether or not he meets the requirements of the Listings.

The ALJ's determination as to Step Three is not supported by substantial evidence. The record, including Plaintiff's written submissions and testimony during the hearing, clearly

21

demonstrates that Plaintiff suffers from a mental impairment. While the burden is on Plaintiff at this step of the analysis, the ALJ also has a duty to develop the record with regard to the effect of Plaintiff's mental impairment on his ability to work. *Johnson v. Chater*, 969 F. Supp. 493, 507 (N.D. Ill. 1997). While it does appear from the subjective reports of Mr. Peggau that part of the blame for the inadequacy of the psychological evidence may rest with Plaintiff, a finding that Plaintiff is not disabled based upon the subjective reports of one psychologist that Plaintiff was uncooperative with regards to the evaluation is insufficient evidence of Plaintiff's limitations. Furthermore, this court notes that had Plaintiff failed to appear for the consultative exam entirely, he likely would have been given the opportunity to attend a rescheduled evaluation. *See*, 20 CFR §404.1518(a) and POMS §DI 22520.019. Given Plaintiff's apparent mental impairments, notwithstanding his lack of cooperation, this court believes that Plaintiff should be given the opportunity to undergo an additional psychological evaluation, with a new consultant who will not be predisposed towards any diagnosis. Further, Plaintiff should be informed that his failure to cooperate to the best of his ability may result in an adverse determination.

D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff has not performed any substantial work related activities in the requisite time period and therefore does not have past relevant work. (Tr. 18). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed. (Tr. 18-19).

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers

22

in the national economy?

At Step Five the ALJ determined that although Plaintiff's Residual Functional Capacity did not allow him to perform the full range of light work, there existed a substantial number of jobs in the national economy that he can perform. (Tr. 18-19). The ALJ concluded that Plaintiff is not disabled based on the full weight of the medical evidence, Appendix 1 to Subpart, 20 CFR 404 and the testimony of a vocational expert. (Tr. 18).

The ALJ noted that Plaintiff is a younger individual, under fifty years old, at all times relevant of the decision, who engaged in ten years of sporadic education and possesses no transferable skills. (Tr. 18). A Residual Functional Capacity Assessment (RFC) was performed on August 11, 1995. (Tr. 174-181). The RFC revealed that Plaintiff had no postural, visual, manipulative, communicative or environmental limitations. (Tr. 176-179). It was also determined that Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently. (Tr. 175). Plaintiff could stand, walk and sit, with normal breaks, for about six hours in an eight hour day. (Tr. 175).

An RFC was again performed on March 22, 1996. (Tr. 207-214). It also revealed that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (Tr. 209-212). It concluded that Plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently and walk, stand or sit, with normal breaks, for about six hours in an eight hour day. (Tr. 208).

Both the 1995 and the 1996 RFC's show that Plaintiff's impairments do not restrict him from performing gainful work related activities. However, because of Plaintiff's non-exertional limitations the ALJ utilized a vocational expert, Mr. Christopher Yep, to examine Plaintiff's characteristics and

capabilities. (Tr. 18.). Mr. Yep testified at Plaintiff's hearing on September 3, 1998. (Tr. 306-314). He classified Plaintiff's past skill level as mostly unskilled and past exertional limitations as medium to light level. (Tr. 308). The ALJ presented Mr. Yep with hypothetical individuals and asked him to offer an opinion as to their capability. (Tr. 308).

The ALJ presented Mr. Yep with an individualized hypothetical, then modified it to contain various limitations. (Tr. 311-312). Each hypothetical individual possessed limitations that ranged from illiteracy to a tolerable absenteeism rate. (Tr. 311-312). After each modification the ALJ would ask Mr. Yep to assess the potential positions available and their prevalence in Illinois. (Tr. 311-312). Upon review of the various hypotheticals, it was determined that an individual with Plaintiff's capabilities could perform the positions of inspector, hand packager and cashier. (Tr. 310). In the Sate of Illinois there are 44, 773 hand packager positions, 24, 457 inspection positions and 129, 117 cashier positions. (Tr. 310).

The ALJ's decision at Step Five is not supported by the record. Where an ALJ denies benefits, the ALJ must "build an accurate and logical bridge from the evidence to [the] conclusion." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). In establishing Plaintiff's RFC the ALJ noted that no greater limitations than those found in the decision were warranted. The ALJ determined that the evaluation of Plaintiff by Mr. Peggau is invalid due to Plaintiff's blatant lack of cooperation and, as a result, there is no evidence upon which to base a finding of an affective disorder or mental retardation. (Tr. 16). Based upon the evidence in the record, the ALJ determined that Plaintiff has a personality disorder, but that the disorder was stable when the Plaintiff was not using alcohol or drugs. In the end, the ALJ found that Plaintiff was limited in that he could not perform complex or detailed tasks, but that limitation in

24

conjunction with Plaintiff's physical limitations did not preclude Plaintiff from performing work existing in significant numbers in the national economy.

With respect to Plaintiff's claims regarding his impairments, the ALJ stated that his conclusion regarding the credibility of Plaintiff's allegations are a result of the ALJ's consideration of the totality of the evidence and not of any single factor. (Tr. 18). This is insufficient. Social Security Ruling 96-7p provides that an ALJ's determinations regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski* at 887 (citing SSR 96-7p). The ALJ's conclusory statement that the totality of the evidence supports the credibility findings does not adequately specify what evidence supports the credibility finding. The ALJ failed to identify any specific inconsistencies between Plaintiff's claimed limitations and those supported by the record.

While the I.Q. and personality tests administered by Mr. Peggau may be invalid, the remainder of Mr. Peggau's report constitutes the most recent observations of Plaintiff's mental functioning contained in the record. That report indicated that "the claimant's ability to maintain ongoing employment is guarded at best because of his lack of motivation." (Tr. 238). Mr. Peggau recommended that any funds distributed to Plaintiff be funneled through a third party due to Plaintiff's poor judgment. (Tr. 238). Plaintiff was noted to be limited in regard to his mental agility and his deductive reasoning skills were demonstrably impaired. (Tr. 236-237). The ALJ does not appear to have taken any of these factors into consideration when determining Plaintiff's RFC. At the hearing, very little testimony regarding Plaintiff's mental limitations was solicited. Plaintiff was

briefly questioned by his attorney regarding his limited literacy and his poor memory. (Tr. 281-282 and 291-292). The majority of the hearing focused on Plaintiff's physical disability and the functional limitations that derive from that impairment. The ALJ did not question Plaintiff at all regarding his mental capabilities.

For the above reasons, this court finds that the ALJ's decision at Step Five is not supported by substantial evidence. As found with respect to Step Three, Plaintiff should undergo a psychological exam with a new examiner. Plaintiff should be informed that his failure to cooperate in the exam may result in an adverse determination. Any RFC analysis should fully take into account Plaintiff's limitations from his mental impairments.

## VII. CONCLUSION

For the forgoing reasons Plaintiff's motion for judgment on the administrative record and pleadings is granted. Defendant's motion for summary judgment is denied. This case is remanded to the Commissioner for proceedings consistent with the above opinion.


**ENTER:**


P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

**DATE:** 8/27/01